**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

ROSE BROWN, INDIVIDUALLY, AND
AS ADMINISTRATOR AD
PROSEQUENDUM OF THE ESTATE OF
SHAWN BROWN,

Plaintiffs,

v.

CITY OF ATLANTIC CITY, DET.
JAMES HERBERT, DET. HOWARD
MASON, AND DET. MICHAEL RUZZO,

Defendants.

Civil No. 15-6711(RMB/AMD)

**OPINION**

**APPEARANCES:**

LAW OFFICES OF ANDAIYE AL-UQDAH
By: Andaiye Al-Uqdah, Esq.
309 Fellowship Road, Suite 200
Mount Laurel, New Jersey 08054
    Counsel for Plaintiffs Rose Brown and
    the Estate of Shawn Brown

CARTER & MCKEE, LLC
By: James J. Carter, Esq.; Randy George McKee, Esq.
1100 Poydras Street, Suite 1475
New Orleans, Louisiana 70163
    Counsel for Plaintiffs Rose Brown and
    the Estate of Shawn Brown

HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
By: Susan K. O'Connor, Esq.
40 Paterson Street, P.O. Box 480
New Brunswick, New Jersey 08903
    Counsel for Defendant City of Atlantic City

MICHAEL A. ARMSTRONG & ASSOCIATES, LLC
By: Morrison Kent Fairbairn, Esq.
79 Mainbridge Lane
Willingboro, New Jersey 08046
    Counsel for Defendant City of Atlantic City

SAPONARO LAW GROUP
By: George R. Saponaro, Esq.; Stephen E. Parrey, Esq.
27 Cedar Street
Mount Holly, New Jersey 08060
    Counsel for Defendants James Herbert,
    Howard Mason, and Michael Ruzzo

LAW OFFICES OF RILEY & RILEY
By: Tracy L. Riley, Esq.
100 High Street, Suite 302
Mount Holly, New Jersey 08060
    Counsel for Defendants James Herbert,
    Howard Mason, and Michael Ruzzo


**RENÉE MARIE BUMB**, UNITED STATES DISTRICT JUDGE:

Plaintiffs Rose Brown and the Estate of Shawn Brown

("Plaintiffs") bring this civil action in connection with a

shooting that resulted in the death of Shawn Brown ("Brown") on

September 9, 2014.  Now, this matter comes before the Court upon

Motions for Summary Judgment, filed by Defendant City of Atlantic

City ("Atlantic City")[Dkt. No. 145] and Defendants Det. James

Herbert, Det. Howard Mason, and Det. Michael Ruzzo (the

"Detectives" or "Officers")[Dkt. No. 151].  For the reasons set

forth herein, Atlantic City's Motion for Summary Judgment will be

**GRANTED**.  Additionally, the Officers' Motion for Summary Judgment

will be **GRANTED IN PART and DENIED IN PART.**

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On September 9, 2014, Detectives Herbert, Mason, and Ruzzo were on duty in Atlantic City, New Jersey, wearing plain clothes while undercover drug purchases with the assistance of a confidential informant. See Atlantic City's Statement of Undisputed Material Facts ("AC SUMF")[Dkt. No. 145-2], at ¶ 53. Shortly after completing a drug purchase, the Officers were traveling in their vehicle to another buy when Detective Herbert heard gunshots in the vicinity. Id. at ¶ 57. The Officers contacted dispatch for confirmation from "Shot Spotter" (an acoustic device used to pinpoint the location of gunfire within the city limits). See id. at ¶¶ 55, 57.  Within a few minutes, dispatch confirmed that multiple gunshots had been detected near Drexel Avenue on Route 30; only two blocks away from the Officers' location.[1] Id. at ¶ 58. Due to their proximity, the Officers immediately rerouted their vehicle to the area of the shooting. Id.

Upon turning onto Mediterranean Avenue, a confidential informant gestured to indicate that the individual walking behind

---

[1] The ShotSpotter report confirms that eleven (11) rounds were fired in the parking lot of the Cedar Food Market at the corner of Pennsylvania Avenue and Adriatic Avenue, by Route 30, at approximately 12:55 p.m. on September 9, 2014. See AC SUMF, at ¶ 55.

3

him, later identified as Shawn Brown, was the shooter.[2] See AC SUMF, at ¶¶ 64-65.  The Officers observed that Brown "appeared nervous, and was continuously looking over his shoulder." Id. After making eye contact with the Officers in their vehicle, Brown began to flee down a nearby side street. Id. at ¶¶ 70, 72. While running away, the Officers observed Brown clutch at his waistband and produce a handgun. Id. at ¶ 72. The Officers, who were wearing badges around their necks, repeatedly identified themselves as police and ordered Brown to stop, but he neither stopped nor dropped the gun.  Id. at ¶¶ 73-74.

The Officers pursued Brown in their vehicle as he rounded the corner from North Bartlett Street onto Drexel Avenue, where he stumbled into some vegetation. See AC SUMF at ¶¶ 75, 78. Det. Mason stopped the vehicle at the corner of North Bartlett Street and Drexel Avenue, where Det. Ruzzo exited the vehicle and moved towards Brown. Id. at ¶ 79.  At that point, Brown turned to face the Officers with his gun pointed in their direction. Id. at ¶ 81.[3] In response, Det. Ruzzo fired four to six rounds at Brown. Id. at ¶ 82.  Detective Herbert sought cover behind the vehicle's

---

[2] Ballistics tests later confirmed that the shots near the Cedar Food Market were, indeed, fired from Shawn Brown's handgun. See AC SUMF, at ¶ 63.

[3] Although Plaintiffs disputed this statement in Atlantic City's SUMF, Plaintiffs' expert conceded this fact. See infra, Section III.A.

metal frame, but then exited the vehicle and fired one to two shots at Brown. Id. at ¶¶ 83, 85.    After Det. Ruzzo and Det. Herbert had begun firing at Brown, still holding the handgun, Brown turned and began running down Drexel Avenue. Id. at ¶ 89. Det. Ruzzo fired one or two more rounds at Brown before he observed blood on Brown's shirt. Id. Brown fell to the sidewalk and dropped his gun. Id.

The parties offer differing accounts of what occurred after Brown fell to the ground.  The Officers state that they observed Brown attempt to stand up and move towards his gun, causing Det. Ruzzo and Det. Herbert to each fire an additional round to subdue the perceived threat. Id. at ¶ 91. However, two witnesses contend that Brown was facing the Officers, with both hands raised without a gun, yelling "don't shoot," when Det. Ruzzo and Det. Herbert each fired their final shots at Brown.[4]  See Deposition of Dekrex Davis ("Davis Deposition")[Dkt. No. 155-4]; Gertrude Pettus Statement to Investigators, Sept. 15, 2014 ("Pettus Statement – 9/15/14")[Dkt. No. 155-9].  After firing his final round, Det. Herbert approached Brown with his gun drawn,

---

[4] The witness accounts differ somewhat.  Whereas Dekrex Davis testified at his deposition that he heard Brown yell "I'm hit, don't shoot me," the other witness, Gertrude Pettus, told officers that she only heard Brown yell "don't shoot."  Ms. Pettus later told investigators that she had not heard any yelling before the shots were fired. See Gertrude Pettus Statement to Investigators, Oct. 7, 2014 ("Pettus Statement – 10/7/14")[Dkt. No. 155-10].

instructed Brown not to move, and stood over Brown's gun (which was loose on the ground near his body). See AC SUMF, at ¶ 91. After the last gunshots, Brown allegedly told the Officers he was "done" and pushed himself further away from his weapon. Id. at ¶ 105.

At approximately 12:57 p.m., Det. Herbert notified dispatch that multiple shots had been fired and requested an ambulance. See AC SUMF, at ¶ 93. Det. Ruzzo also requested an ambulance at 12:58 p.m. Due to the nature of Brown's injuries, Det. Herbert, at 12:58 p.m. once again emphasized to dispatch that an ambulance was needed. Id. at ¶ 106. The entire sequence, from when the Officers first witnessed Brown with a handgun to when an ambulance was called, lasted approximately one minute. Id. at ¶ 99. The Officers did not administer any medical assistance, such as CPR, to Brown at the scene. Prior to the ambulance's arrival, Sergeant Craig Mulhern arrived at the scene, where he handcuffed and searched Brown, finding that Brown had been carrying forty (40) bags of heroin. Id. at ¶ 110.

Paramedics and EMTs arrived at the scene at approximately 1:01 p.m. and left for the hospital at 1:15 p.m., after Brown had been intubated and administered epinephrine. See AC SUMF, at ¶ 107. At that time, Brown was unresponsive, his pulse was weak, he was unconscious, and he had agonal respiration. Id. When Brown arrived at AtlantiCare Regional Medical Center, at 1:19 p.m., he

was asystolic, with his pupils fixed and dilated. Id. at ¶ 108. Brown later coded in the operating room and was pronounced dead at 2:16 p.m. Id. The record contains no evidence indicating that Brown would have survived if he had received different, or more expedient, medical care.

An autopsy, performed by Daksha Shah, M.D., Designated Medical Examiner (the "DME"), on September 10, 2014, determined that three (3) bullets struck Brown. See AC SUMF, at ¶ 114. The DME found that the gunshot wound to the right side of Brown's chest caused his death. Id. According to the DME, the fatal shot had a downward trajectory and hit Brown on the front side of his chest, passing through his right lung and exiting out his back. See Autopsy Report [Dkt. No. 145-8, Ex. 43], at 5. The DME noted that Brown's other two (2) gunshot wounds, to his lower back and the lateral side of his left thigh, did not cause any internal injuries or pass through any major organs. Id. Because the fatal shot hit Brown on the front of his chest, the evidence suggests that the fatal shot was likely one of the final shots fired by Det. Ruzzo or Det. Herbert, occurring after Brown had fallen and was turning towards the Officers. However, it is unknown whether the fatal shot was fired by Det. Ruzzo or Det. Herbert.[5] See AC SUMF, at ¶ 114.

---

[5] It is undisputed that Det. Mason did not fire his weapon at any point during the incident. See AC SUMF, at ¶ 35.

The Atlantic County Prosecutor's Office ("ACPO") conducted an extensive investigation into the events surrounding Brown's death. See AC SUMF, at ¶ 109. At the conclusion of the investigation, the ACPO presented the case to a Grand Jury, which heard testimony from multiple witnesses and examined evidence. Id. at ¶ 133. Ultimately, the Grand Jury returned a "no bill," indicating that the Grand Jury found that the evidence was insufficient to support criminal charges against Det. Herbert or Det. Ruzzo. Id. at ¶ 134. Following the conclusion of the ACPO investigation and the Grand Jury proceedings, the Internal Affairs Unit of the Atlantic City Police Department performed its own investigation into the shooting. Id. at ¶ 138. The Internal Affairs investigation concluded that the Officers' use of deadly force was legal, proper, and justified. Id. at ¶ 139. The investigation further concluded that neither Det. Herbert nor Det. Ruzzo violated any rules, regulations, policies, or procedures. Id.

On September 8, 2015, Plaintiffs commenced this action against the City of Atlantic City, the Atlantic City Police Department, and Police Officers John Does #1-3 [Dkt. No. 1], alleging, among other things, constitutional violations for failure to train, excessive force, and failure to render timely and proper medical assistance. On May 30, 2016, Plaintiffs filed

an Amended Complaint, which contained five causes of action,[6] specifically: (Count I) Violations of the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution under 42 U.S.C. § 1983 against the Defendant Officers; (Count II) Violations of the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution under 42 U.S.C. § 1983 (a.k.a. Monell claims) against Atlantic City; (Count 3) Assault, Battery, Negligence, Spoliation of Evidence, Wrongful Death under N.J.S.A. § 2A:31, and a Survivor Action under N.J.S.A. § 2A:15-3 against the Defendant Officers; (Count IV) Conspiracy to Violate Civil Rights against the Defendant Officers; and (Count V) Punitive Damages against the Defendant Officers.[7] Among other forms of requested relief, Plaintiffs seek ten million dollars ($10,000,000) in damages. The Atlantic City Police Department was dismissed as a defendant, with prejudice, in January 2017. Discovery concluded in November 2018. Now, this matter comes before the Court upon Motions for Summary Judgment, filed by the Officers and Atlantic City.

---

[6] Although the Amended Complaint asserted causes of action against the Officers, by name, they were not substituted into the case caption until February 24, 2017.

[7] The Amended Complaint alleges that the § 1983 claims in Counts I and II are brought for violations of the "Fourth, Eighth, and Fourteenth Amendments." For purposes of this motion, the Court assumes that these are misstatements, and that Plaintiffs intended to allege violations of the "Fourth, Fifth, and Fourteenth Amendments."

## II. __LEGAL STANDARD__

### *A. Summary Judgment Standard*

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might impact the "outcome of the suit under the governing law." Gonzalez v. Sec'y of Dept of Homeland Sec., 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. Id.

In determining the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable inferences and doubts should be resolved in favor of the nonmoving party. Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 387 (3d Cir. 2010). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). Moreover, a court need not adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 372, 380 (2007). In the face of such evidence, summary judgment is still appropriate "where the record taken as a whole could not lead a rational

trier of fact to find for the nonmoving party." <u>Walsh v. Krantz</u>, 386 F.App'x 334, 338 (3d Cir. 2010).

The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." <u>Connection Training Servs. v. City of Phila.</u>, 358 F. App'x 315, 318 (3d Cir. 2009). "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate." <u>Id.</u> In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: he "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. <u>Orsatti v. New Jersey State Police</u>, 71 F.3d 480, 484 (3d Cir. 1995); <u>accord.</u> <u>Jackson v. Danberg</u>, 594 F.3d 210, 227 (3d Cir. 2010) (citing <u>Acumed LLC. v. Advanced Surgical Servs., Inc.</u>, 561 F.3d 199, 228 (3d Cir. 2009)("[S]peculation and conjecture may not defeat summary judgment."). Moreover, "the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial"; the evidence does not need to be in admissible form at the time of summary judgment. <u>FOP v. City of Camden</u>, 842 F.3d 231, 238 (3d Cir. 2016).

## B.    Qualified Immunity Standard

The doctrine of qualified immunity "exempts a police officer, who is sued for a violation of an individual's constitutional rights, from trial and liability for the alleged wrong." Goode v. City of Philadelphia, 2018 WL 827425, at *3 (E.D. Pa. Feb. 12, 2018)(citing Carswell v. Borough of Homestead, 381 F.3d 235, 241 (3d Cir. 2004)).  To determine the doctrine's applicability, a court must ascertain whether the facts shown by the plaintiff "make out a violation of a constitutional right" and assess whether that right "was 'clearly established' at the time of the defendant's alleged misconduct." Martin for Estate of Webb v. City of Newark, 762 F. App'x 78, 82–83 (3d Cir. 2018)(quoting Pearson v. Callahan, 555 U.S. 223, 232). If both of these factors are present, the Court must assess whether the officer "made a reasonable mistake as to what the law requires." Carswell, 381 F.3d at 242. "[I]f the officer's mistake ... is reasonable, [then] the officer is entitled to the immunity defense." Id. (quoting Saucier, 533 U.S. at 205).

## III. **ANALYSIS**

In moving for summary judgment, the Officers argue that they are entitled to qualified immunity because their use of deadly force was objectively reasonable under the circumstances and they were not indifferent to Brown's medical needs.  The Officers also

argue that Plaintiffs' state law tort claims must be dismissed because they were never served with a notice of claims under the New Jersey Tort Claims Act ("NJTCA"). Additionally, Atlantic City argues that Plaintiffs' Monell claims have no basis for municipal liability under § 1983, because they have failed to establish that the City itself caused the alleged constitutional violation.

### A.  *Qualified Immunity*

Plaintiffs contend that the Officers violated Brown's constitutional rights by unreasonably using excessive force that resulted in Brown's death. Indeed, one of the "clearly established" protections afforded by the Fourth Amendment of the U.S. Constitution is the right to be free from the use of excessive force by a law enforcement officer. See Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004)(citing Graham v. Connor, 490 U.S. 386, 395 (1989)).

In their Motion for Summary Judgment, the Officers argue that they are entitled to qualified immunity because their actions were objectively reasonable under the circumstances. On this issue, the Court finds that the Officers' actions during their pursuit of Brown, including the use of deadly force, were objectively reasonable from the moment the pursuit began, until Brown fell to the ground and dropped his gun. However, the Court

finds that genuine issues of material fact preclude summary judgment as to whether it was objectively reasonable for Det. Herbert and Det. Ruzzo to use deadly force after Brown had fallen to the ground and dropped his weapon.

"To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." Lamont v. New Jersey, 637 F.3d 177, 182-83 (3d Cir. 2011).  As stated by the Third Circuit, the "use of deadly force is a seizure, and it is unreasonable 'unless the officer has good reason to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" Goode v. City of Philadelphia, 2019 WL 2393794, at *2 (3d Cir. June 6, 2019)(quoting Lamont, 637 F.3d at 183).

In deciding whether the conduct at issue rises to the level of "excessive," a court must use an objective reasonableness standard, which "requir[es] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Saucier v. Katz, 533 U.S. 194, 205 (citing Graham, 490 U.S. at 396). Other factors include, "the duration of the [officer's] action, whether the action takes place in the context

of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Couden v. Duffy, 446 F.3d 483, 497 (3d Cir. 2006)(quoting Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997)). In evaluating these factors, a court may not apply "the 20/20 vision of hindsight," but must instead recognize that police officers are often faced with split-second decisions in "circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 396-97.

The facts in the record support a finding that the Officers' initial pursuit of Brown, along with the use of deadly force, were objectively reasonable until the moment Brown first fell to the sidewalk.  Indeed, when the Officers first arrived in the area of the Cedar Food Market shooting, the Officers reasonably (based on the assistance of a confidential informant), and correctly, believed that Brown was the perpetrator of the nearby shooting.  As such, the Officers did not unreasonably "target" Brown, as alleged in the Amended Complaint.  On the contrary, the

facts demonstrate that the Officers had a legitimate reason to pursue Brown.[8]

During the Pursuit, Det. Ruzzo and Det. Herbert identified themselves as police and only began firing at Brown after they observed him remove a gun from his waistband and turn it towards the Officers.  The Supreme Court has held that, when "the suspect threatens the officer with a weapon ..., deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." Tennessee v. Garner, 471 U.S. 1, 11-12, 105; see also Abraham v. Raso, 183 F.3d 279, 289 (3d Cr. 1999)(explaining that courts must ask whether it was "objectively reasonable for the officer to believe ... that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others").  On this issue, Plaintiffs have failed to point to any evidence in the record to refute the Officers' reports that during the pursuit, Brown removed the gun from his waistband and turned it towards the Officers.  In fact, Plaintiffs' own expert seemingly concedes that Brown pointed the

---

[8] Throughout the Amended Complaint, Plaintiffs make various allegations that insinuate that the manner in which the Officers pursued Brown (initially in their police vehicle) was objectively unreasonable and excessive.  However, given that the officers had a legitimate reason to pursue Brown and it is undisputed that no shots were fired from the police vehicle during the pursuit, the Court finds Plaintiffs' arguments about the Officers' use of the vehicle irrelevant in the excessive force analysis.

gun at the Officers. See Report of W. Lloyd Grafton ("Grafton Report")[Dkt. No. 145-8, Ex. 47], at 5 (stating that"[a]t the point where Brown was fleeing and being shot at, the officers only knew he was in the area where shots were fired, he was running from them – and he had pointed the gun in their direction").

Considering that a confidential informant had already identified Brown as the perpetrator of a nearby shooting, the Officers had reason to believe that Brown was willing to use his gun. Therefore, once the Officers observed Brown turn towards them with the gun in his hand, it was reasonable for the Det. Ruzzo and Det. Herbert to use deadly force until the threat had been neutralized. To that end, the use of deadly force was objectively reasonable until the Officers saw Brown fall to the ground with blood on his shirt and drop his gun.

Although this Court finds that the Officers' initial use of deadly force was objectively reasonably, genuine issues of material fact prevent this Court from determining the reasonableness of the final shots fired by Det. Ruzzo and Det. Herbert. Notably, the Third Circuit has held that "[e]ven where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished." Lamont, 637 F.3d at 184. In Lamont, state troopers began firing upon when a suspect,

who was later found to be unarmed, when the suspect "yanked his right hand out of his waistband" as if drawing a pistol. Id. There, the Third Circuit found that the troopers reasonably believed that the suspect was armed and pulling a gun when they began firing. However, because the suspect's weaponless hand had been fully visible immediately after the troopers began firing, the Third Circuit held that "a reasonable jury could conclude that the troopers should have recognized that [the suspect] was unarmed and stopped firing sooner." Id. Furthermore, because some of the bullets had hit the suspect from behind, the Third Circuit opined that "a jury may find that the troopers improperly continued firing after [the suspect] had turned away from them and no longer posed a threat." Id. at 184-85.

In this case, there are vastly different accounts about what transpired in the moments immediately preceding the fatal shots. Whereas the Officers claim that Brown was attempting to stand up and move towards his gun, Plaintiffs offer testimony from two witnesses who claim that Brown was attempting to surrender by raising his hands and yelling "don't shoot."[9]

---

[9] The Court acknowledges that Plaintiffs' witnesses have substantial credibility issues. Indeed, Gertrude Pettus has given conflicting statements regarding the shooting. On September 15, 2014, Ms. Pettus told investigators that she saw "three people shooting their guns as a young man faced them with both hands up" and yelled "don't shoot!" However, on October 7, 2014, Ms. Pettus told investigators that "the shots seemed to be happening while the victim was turning towards the white males"

At the summary judgment stage of litigation, where there is a genuine issue of material fact, the Court must "adopt[ ] ... the plaintiff's version of the facts," for purposes of assessing qualified immunity. <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007);

---

and that "she did not hear any yelling or screaming prior to the shots or during the shots." At the time of her second statement, Ms. Pettus also requested that her name not be disclosed, because she feared for her life if anyone in her community learned of her involvement in this case.

Meanwhile, the other witness, Dekrex Davis, has an extensive criminal record and served eleven and a half years in prison for attempted murder. Additionally, in a cell phone video, recorded by Mr. Davis at the scene following the shooting, Mr. Davis can be overheard making disparaging comments about the police, which could suggest bias against the police and motivation to be untruthful. Mr. Davis' testimony is also questionable from a factual perspective. Specifically, Mr. Davis contends that Brown "got up" with his hands in the air at the time he was shot. This testimony is somewhat inconsistent with the autopsy report, which showed that the fatal shot hit Brown with a downward trajectory, suggesting that Brown was not standing upright at the time. However, the Court recognizes that a jury could excuse the discrepancies as imprecise phrasing by Mr. Davis.

Although these inconsistencies raise credibility issues, "in considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004)(quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)). That being said, if a jury ultimately finds no liability due to credibility issues (which would be the second similar finding, following the Grand Jury's decision to "no bill" the Officers), "District courts are entitled to award reasonable attorneys' fees to prevailing defendants in § 1983 matters 'upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation.'" <u>Arneault v. O'Toole</u>, 718 F. App'x 148, 152 (3d Cir. 2017)

see also <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1866 (2014); <u>Brosseau</u>
<u>v. Haugen</u>, 125 S. Ct. 596, 195 n.2 (2004); <u>Saucier</u>, 533 U.S. at
201.  As such, for purposes of this motion, the Court must make
all reasonable inferences in favor of Plaintiffs. <u>See</u> <u>Pratt v.</u>
<u>City of Camden</u>, 2018 WL 3201785, at *8-9 (D.N.J. June 29, 2018).
Certainly, if Brown was surrendering to police, further shots
would not be objectively reasonable or entitled to qualified
immunity protections.  Accordingly, this Court finds that a
reasonable jury could conclude that Brown no longer posed a risk
to the Officers after he had fallen to the ground and dropped his
gun.

Although Plaintiffs' § 1983 claim against Det. Ruzzo and
Det. Herbert survives, as it relates to the reasonableness of the
final shots, the Court will dismiss all aspects of the § 1983
claim against Det. Mason because it is undisputed that Det. Mason
never fired any shots at Brown during the incident.  The Court
will also dismiss any aspects of Plaintiffs' claims that relate
to constitutional violations for handcuffing Brown after the
shooting or failing to render proper medical assistance.
Significantly, Brown was handcuffed by Sergeant Craig Mulhern;
not any of the Officers in this case.  Additionally, Plaintiffs
fail to point to any evidence in the record suggesting that the
Officers would have been able to provide any meaningful medical
assistance or waited too long to call for help.  Furthermore,

there is no evidence that the Officers conspired with each other, either explicitly or implicitly, to deprive of Brown of his constitutional rights.  As such, dismissal is warranted on those claims.

### B.    *The New Jersey Tort Claims Act*

Next, the Officers argue that the state law tort claims must be dismissed because Plaintiffs failed to properly serve them with a notice of claim.  The New Jersey Tort Claims Act ("NJTCA") requires notice of a claim of injury against a public entity or employee to be presented within ninety days of the accrual of a cause of action. See N.J.S.A. 59:8-3 ("No action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter").  After the notice of claim is filed, a plaintiff must wait six months before filing suit against the public entity or employee in an appropriate court. Id.  A plaintiff is forever barred from recovering damages from a public entity if "he fail[s] to file his claim with the public entity within ninety (90) days." N.J.S.A. 59:8-8.

The Officers contend that the notice of claim submitted to the City of Atlantic City was improper because it did not name the Officers, even under John Doe designations, and because

Atlantic City was not a proper entity to accept service of a
notice of claim on behalf of the Officers. Plaintiffs seemingly
concede that a notice of claim was only served upon the City of
the Atlantic City, not upon the Atlantic City Police Department
or the individual Officers. However, Plaintiffs argue that the
notice of claim submitted to Atlantic City was sufficient and
they should be relieved of the notice of claim obligation because
the identities of the Officers were unknown to Plaintiffs and
"Atlantic City and the Atlantic City Prosecutor's Office would
not provide the names of the officers involved in the incident."
Pls.' Opp. to Officers' MSJ [Dkt. No. 155], at 15. Furthermore,
Plaintiffs contend that "the Defendant Officers have not been
prejudiced by not receiving the notice under the [NJTCA]" and
"have waived the right to make this argument by not filing a Rule
12(b)(6) Motion to Dismiss and conceding jurisdiction in this
matter to the Plaintiffs." Id.

The Court finds Plaintiffs' arguments, that they should be
relieved of the notice of claim requirements, unpersuasive,
because Courts have repeatedly held that plaintiffs must strictly
adhere to the NJTCA's language, regardless of circumstances. See,
e.g., Baker v. Allen, 2006 WL 1128712, at *16 (D.N.J. Apr. 24,
2006)("Strict compliance is required to satisfy the Tort Claims
Act, and the filing of a complaint is not a substitute for a
notice of claim"); Noble v. City of Camden, 112 F. Supp. 3d 208,

232-34 (D.N.J. 2015)("the filing of the Complaint in this case does not satisfy the notice requirement").

The Officers cite compelling case law, which suggests that a city and its police department are distinct entities for purposes of serving of a notice of claim under the NJTCA. See Forcella v. City of Ocean City, 70 F. Supp. 2d 512, 521 (D.N.J. 1999)(holding that "the Ocean City Police Department should have received a separate notice of claim from all other public entities, including the City of Ocean City and DPS"). However, it is not immediately clear to this Court whether that is true for all municipalities, or if the cited case involved a city with a unique municipal structure. Without further briefing, the Court is unable to determine whether the same distinction applies to Atlantic City and the ACPD, as it relates to service under the NJTCA.

Unfortunately, the Court has been unable to evaluate the sufficiency of the actual notice of claims in this instance. Despite the Court's best efforts, it could not locate the document anywhere in the record.[10]  Without the ability to review

---

[10] Although the Officers' Memorandum in Support of their Motion for Summary Judgment has a placeholder citation for an exhibit, it appears that, in an apparent error, the number of the exhibit was never filled-in and was, perhaps, left out of the record entirely.  The Court acknowledges the possibility that it overlooked the document among the voluminous exhibits submitted to this Court, but, at this time, the Court does not believe that the notice of claims was ever entered into the record.

the actual notice of claims, the Court cannot reach this issue. As such, the Court will deny this aspect of the Officers' Motion for Summary Judgment, but without prejudice. If the Officers wish to renew their Motion for Summary Judgment on the NJTCA issue, they must submit a copy of the notice of claims for this Court's inspection. Additionally, the Court would encourage both parties to provide more precise and responsive briefing on this issue, if the motion is renewed.

### C. Municipal Liability

Finally, Atlantic City argues that Plaintiffs' Monell claims against the city must be dismissed. It is well established that municipal liability under § 1983 "may not be proven under the respondeat superior doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990)(citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978)). Thus, a municipality is liable under § 1983 only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell, 436 U.S. at 694. In this case, Plaintiffs' Monell claims are based on an Atlantic City's alleged failure to properly train, supervise, discipline, and enact policies, which

allows police officers to conduct arrests with "the use of illegal and excessive force."

Where the policy at issue "concerns a failure to train or supervise municipal employees, liability under § 1983 requires a showing that the failure amounts to deliberate indifference to the rights of persons with whom those employees will come into contact." Thomas v. Cumberland Cty., 749 F.3d 217, 222 (3d Cir. 2014) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). Moreover, "the deficiency in training must have actually caused the constitutional violation." Thomas, 749 F.3d at 217 (quoting Canton, 489 U.S. at 391).

The Supreme Court has made clear that "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 410 (1997)(internal quotations omitted). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011)(internal citation omitted). Nevertheless, in certain situations, the need for training "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." Canton, 489 U.S. at 490 n.10 (internal citation omitted). Liability in

single-incident, failure-to-train cases thus depends on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." Bryan Cty., 520 U.S. at 409.

In the present case, Plaintiffs have offered no evidence in the record of a history or pattern of excessive force by the Atlantic City Police Department against armed suspects who are attempting to evade arrest. Therefore, Plaintiffs would need to rely on a single-incident theory of liability. See Pratt, 2018 WL 3201785, at *11. Even under a single-incident theory of liability, Plaintiffs still have not offered any evidence that would allow a reasonable jury to find that the risk of Brown's death was a "highly predictable consequence" of Atlantic City's failure to train its Officers or medical personnel. See Bryan Cty., 520 U.S. at 409 (citing Canton, 489 U.S. at 390 n.10).[11] Indeed, there was no evidence in the record suggesting that

---

[11] Plaintiffs offer testimony suggesting that Atlantic City failed to properly train officers on how to pursue a suspect, who is on foot, while the officers are in a vehicle. However, as previously noted, the pursuit itself was lawful and no shots were fired while the Officers were in their vehicle. Thus, the manner in which the pursuit was initiated had no impact on the alleged excessive force, which occurred after Det. Ruzzo and Det. Herbert had already exited the vehicle. Furthermore, to the extent Plaintiffs' claim that Atlantic City failed to properly train the Officers, EMTS, or paramedics on rendering medical assistance, Plaintiffs have failed to offer any evidence that better medical care would have avoided Brown's death or alleviated pain and suffering.

Atlantic City failed to properly train officers on the use of firearms.  Accordingly, Plaintiffs' <u>Monell</u> claims against Atlantic City must be dismissed.

### D.   *Additional Matters*

On August 15, 2019, this Court entered an Order [Dkt. No. 164], temporarily granting Defendant Atlantic City's request to seal various grand jury and internal affairs documents.  However, this Court notes that Atlantic City's Motion to Seal [Dkt. No. 147] never addressed why a less restrictive alternative, such as redactions, would not suffice for these documents.  Accordingly, the Court will order Atlantic to file redacted versions of these exhibits with thirty (30) days, or provide a justification as to why redactions would not provide sufficient protection.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Atlantic City's Motion for Summary Judgment will be **GRANTED** and Plaintiffs' claims against Atlantic City will be **DISMISSED WITH PREJUDICE**.  Additionally, the Officers' Motion for Summary Judgment will be **GRANTED IN PART**, and **DENIED IN PART**.

All claims against Det. Mason, the conspiracy claim, the state law claim (regarding failure to render timely medical assistance), and the § 1983 claim against Det. Ruzzo and Det. Herbert (to the extent it pertains to any aspect of the incident

other than the moments between when Brown fell to the ground, dropping his gun, and when the Officers called for medical assistance) will be **DISMISSED WITH PREJUDICE.**

Plaintiffs' § 1983 claim shall remain against Det. Ruzzo and Det. Herbert as it relates to the moment that the fatal shot was fired. Additionally, the Officers' motion is denied, without prejudice, as it pertains to the state law tort claims (except for those related to failure to render medical assistance, which are dismissed for a failure of proof). The Officers will be permitted twenty-one (21) days from the date of this Opinion to renew their motion regarding the NJTCA issue, with more responsive briefing, accompanied by a copy of the notice of claims. An appropriate Order shall issue on this date.

**DATED:** August 30, 2019

> s/Renée Marie Bumb
> RENÉE MARIE BUMB
> UNITED STATES DISTRICT JUDGE